1

2

3

4                              UNITED STATES DISTRICT COURT

5                            NORTHERN DISTRICT OF CALIFORNIA

6

7     AARON ASHLEY,
                                              Case No.  12-cv-1882-JST
                    Petitioner,
8
            v.
9                                             **ORDER DENYING PETITION FOR
                                              WRIT OF HABEAS CORPUS**
10    GARY SWARTHOUT, Warden,

11                  Respondent.

12

13          Before the Court is Aaron Ashley's petition for a writ of habeas corpus, filed pursuant to

14    28 U.S.C. § 2254.  Ashley challenges the validity of a judgment obtained against him in state

15    court.  Respondent filed an answer to the petition, though petitioner did not file a traverse.

16                              **I.  PROCEDURAL HISTORY**

17          On June 4, 2009, an Alameda County jury convicted petitioner of two counts of second

18    degree murder and found true that he used a deadly weapon and inflicted great bodily injury.

19    (Clerk's Transcript ("CT") at 118-21.)  Petitioner was sentenced to 32 years to life in state prison.

20    (CT at 129-30.)

21          On September 21, 2010, the California Court of Appeal affirmed petitioner's conviction

22    and on November 23, 2010, the California Supreme Court denied his petition for review.  (Ex. 7-

23    9.[1])  Several subsequent habeas petitions were denied by the California Supreme Court.  (Ex. 10-

24    15.)  Petitioner filed a habeas petition in this Court on April 16, 2012.  The case was stayed to

25    exhaust further claims and is now fully exhausted and briefed.

26    / / /

27    _____

28    [1] All references herein to exhibits are to the exhibits submitted by respondent in support of the
      answer.

*United States District Court*
*Northern District of California*

## II.  STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal:[2]

> Defendant Aaron Ashley was convicted by a jury of two counts of second degree murder. There is no dispute that he stabbed Latrice Grayson to death with scissors, also killing her unborn child.  Defendant's contention, rather, is that his trial attorney was ineffective because he failed to object or to seek a mistrial at various points during the trial, and that it is reasonably probable the jury would otherwise have found him guilty only of heat of passion manslaughter.  Ashley's contentions are meritless, and we affirm the judgment.

### BACKGROUND

#### The Prosecution Case

> Grayson was eight months pregnant when she was found slain in her Oakland apartment on the morning of September 7, 2008.  She had been beaten and stabbed some 22 times, mostly around her chest and neck.  Her fetus, a boy, died from anoxia due to his mother's death.

> Security cameras on Grayson's apartment building captured footage of defendant the morning of the slaying.  Around 12:30 a.m. on September 7, defendant was videotaped entering the building.  An hour and 10 minutes later he returned to his car and drove away. Other footage showed defendant get out of the same car shortly before 6:00 a.m. the same day, enter the apartment building, and leave about two minutes later carrying an object in his left hand.  He was wearing dark pants, a dark plaid shirt, and a white t-shirt.  At 9:26 a.m., defendant returned to the building wearing a white t-shirt and cream colored pants. Unlike the two previous trips, this time defendant parked his car about 100 yards away, even though there was a free parking space directly in front of the apartment building.

> Earl Williams was one of Grayson's neighbors.  While he was parking his trucks in his driveway around 9:30 that morning, Williams saw defendant emerge from the apartment building gripping Grayson's four-year-old son J. by the arm.  J. appeared excited and told Williams his mother was "in the house bleeding."  Defendant said that a lady was in the house and looked like she had been stabbed.  Williams asked defendant if he had called the police.  Although defendant was holding a cell phone, he said he had not.  The police arrived shortly thereafter.

> Keith Britton was on his front porch around 9:30 that morning when he saw defendant, whom he did not know, walking rapidly down the street toward Grayson's building. Britton lost sight of defendant for less than a minute and then saw him standing on the

---

[2] This summary is presumed correct.  <u>Hernandez v. Small</u>, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

2

building's front porch.  A very short time after that he saw defendant standing on the porch with J.  Defendant was holding J. by the arm above the elbow, "like a restraint."  Britton knew J. and thought the boy "wasn't himself."  J. "looked like a little ghost," scared and "very, very out of place."  Britton was concerned because he had never before seen J. with defendant.

Just then another neighbor, Robert Spikes, attracted Britton's attention and gestured from his parked truck for Britton to come down to the street.  Spikes was parked close to Grayson's building.  As Britton approached, he heard defendant say, "That lady looks stabbed up in the house."  Britton also asked defendant if he had called 911.  Defendant said he was in the process of calling right then.  Police officers arrived a minute or two later.

Oakland Police Officer Michael Sivila arrived on the scene at 9:36 that morning.  Defendant was standing on the sidewalk in front of Grayson's building.  Officer Sivila entered the apartment and discovered Grayson's body on the couch with a small cushion covering her head.  He initially thought he saw blood dripping on Grayson's neck, but it turned out to be "ants going up and down her body."  Officer Sivila directed Officer Charles Stone to detain defendant as a possible suspect.  As defendant was being handcuffed, J. approached Sivila and said "He didn't do it."  Officer Stone testified that defendant appeared to be extremely nervous, but not upset.

Oakland paramedic Nicko Georgatos responded to Grayson's apartment shortly after 9:30 a.m., while defendant was being arrested and handcuffed.  He thought defendant had a "very calm demeanor, cool and collected."  When Georgatos entered the apartment with other emergency personnel, he saw Grayson's body lying face up on the couch.  There was a great deal of blood on the body, couch and floor.  Georgatos also observed signs of trauma to Grayson's face and what appeared to be multiple stab wounds.  The degree of rigor mortis indicated she had been dead between three and 72 hours.  Pathologist Robert Zedelis, who performed Grayson's autopsy, testified that death probably occurred six to 12 hours before the body was found.  That afternoon defendant told Officer John Haney, "She was going to put the baby up for adoption, but she just changed her mind."

J. appeared to be extremely sad, frightened and angry.  Officer Stone suspected that he was "in some sort of shock."  Around 10:00 a.m., Officer Stone took the following statement from J.: "My name is [J.]. I live in my home with my mommy and my daddy.  It's a messy house.  Mommy and me need to clean up.  My granny is in Atlanta.  Aaron was fighting mommy with his foot and his hands.  Aaron kicked my mommy in the leg and in the ear and in the mouth with his foot like a giant robot.  I'm not going to jail.  I'm a good boy.  My granny's in Atlanta.  She has to go to work.  Aaron hit my mommy on her face and in her belly.  He hit my baby brother.  Babies drink milk.  Mommy was crying like my baby brother.  Ants were on my mommy.  Ants make me tickle.  I have to scratch.  The ants bite mommy.  Aaron hit mommy with the scissors in [the] face.  I didn't do it.  Aaron did it.  Put him in jail.  Aaron came over to my house.  He put the pillow on mommy's head and mommy is still bleeding.  And that's it.  That's it, officer.  Aaron took my green scissors and cut mommy with it, and she's still bleeding.  Aaron is not my daddy.  Marcus is my daddy.  Aaron cut my mommy's face with the scissors in her cheek.  Mommy was mad at Aaron.  He came over to my house.  I said, oh no, not again.  Aaron hit me in the face with

his hand.  I wasn't being bad.  I was being a good boy.  Aaron is so powerful.  Aaron crack me up.  And that's it.  I took the pillow off her head and I said, oh no.  Aaron, Earl or Biggs got to go to jail.  Put them in jail.  All three of them.... This is a true statement."

The police found a broken scissor blade four or five feet from Grayson's body.  There was blood in the living room, on the front door, along the wall near Grayson's body, and in the bedroom.  Bloody towels were found in the bedroom and there was a trail of blood from the outside steps to the location where security video footage showed defendant's car had been parked earlier.  The car was later found about a hundred yards from Grayson's building.  Police observed what appeared to be blood on the exterior of the car.

Oakland Police Department Criminalist Shannon Cavness tested the stains and determined that they were blood.  More than 10 more bloodstains were found inside defendant's car.  DNA testing established the blood on the car's exterior and most from the interior came from the same female donor, and there was only a one in 442 quintillion chance that it came from someone other than Grayson.  No vomit was detected in defendant's car and the autopsy gave no indication that Grayson had recently vomited blood.

Blood was also found on a pair of dark pants and a plaid shirt found at defendant's home.  The stains on the pants were from two donors, one female and the other male.  Neither defendant nor Grayson could be eliminated as a donor.  The shirt had stains from a single female source consistent with Grayson's DNA profile.  Again, the likelihood the source was someone other than Grayson was one in 442 quintillion.

Between about 10 p.m. on September 6 and 9:30 a.m. on September 7, 2008, defendant made 20 phone calls to Grayson's number from a cell phone listed in the name of his wife, Ksandra.  The calls were made from Richmond, where defendant lived, and various locations south, most likely on Interstate 80.  Defendant used the same phone to call 911 at 9:33 a.m. on September 7, 2008, when he reported Grayson's death, and referred to her as "my baby's mother."  The phone was recovered from defendant when he was arrested.

J. was five years old at the time of trial.  He testified that he heard his mother talking on the phone the night of her death.  She was sad and angry.  Later that night when J. was in bed he heard his mother and defendant having a fight.  They were both talking loudly and using bad words.

Oakland Police Sergeant Gus Galindo interviewed defendant on September 7 and September 8, 2008.  He testified that the security videotapes showed defendant walking past Grayson's building only once between 8:30 and 10:30 a.m. on September 7.  Galindo examined defendant's hands and upper torso that morning, and saw no injuries or blood.  Defendant was nervous, cried a couple of times and asked a lot of questions about whether he was going to jail.  Defendant told Galindo that he was 90 to 95 percent sure he was the father of Grayson's unborn child, but did not say that he and Grayson had argued.

In the first interview with Galindo, defendant repeatedly denied any involvement in Grayson's killing.  He said he and Grayson were "friends, messed around with each other," and that he "might be" the father of her child but it was just "a ... one time thing." Defendant's wife did not know about Grayson.  He admitted that he called Grayson 20 or

30 times between 2:00 a.m. and 9:00 a.m. the day she died, because, he said, he was concerned about her health.  He said that at first he was unable to reach her, and later she said she was too busy to talk.  He called her again around 9:00 a .m..  This time J. answered and said his mother was bleeding and not breathing, so defendant drove to Grayson's apartment.  He told Sergeant Galindo that he parked about a block from her building because "It's in a ghetto area and they be shootin' and stuff and you know the park, you right there in front of the liquor store, you know, and everybody in [sic] they mama be comin' past there and everything, there's so much traffic."

When asked about the bloodstains in his car, defendant said Grayson never bled in his car and suggested the blood was his own or his daughter's.  He denied fighting with Grayson or being at her apartment the night she died, even when told that cell phone records would show he had not been in Richmond the whole time, as he claimed.  When Sergeant Galindo suggested that defendant "lost [his] cool and somethin' happen bad," defendant said "I didn't do anything wrong.  I didn't lose my cool.  I would never lose my cool.  I don't do-I would never do anything to nobody.  Not her, not nobody."  Later in the interview, defendant repeated that his emotions are "always in check.  My emotions never like that to hurt anybody."

Defendant continued to deny responsibility for Grayson's death during his second interview with Galindo on September 8.  He also continued to say he believed he was the father of her unborn child.  He said "I think 99 percent sure that I'm the father.  She said it's a possibility but not really she, in her heart, she says I'm the father and I believe what she tell me.  She ain't never lie to me."  He said he initially wanted Grayson to have an abortion and that they "argued constantly over this and everything."  Later, defendant said they agreed Grayson would put the baby up for adoption and he would help her financially.

Defendant continued to deny he was at Grayson's apartment the night of her death even when police told him they had surveillance videos that showed he visited multiple times that night and morning.  Defendant eventually conceded he had gone to Grayson's apartment sometime before 9:30 a.m. "to make sure she's okay," but said he did not go inside.

When confronted with the evidence of Grayson's blood in his car, defendant volunteered for the first time that Grayson had vomited blood in his car the previous Friday.  He said he forgot to mention this the day before when Sergeant Galindo asked him if Grayson had ever bled in his car.  He also said Grayson told him she was bleeding the previous week and he gave her some napkins, but then he said she did not bleed in his car.  Defendant continued to deny police suggestions that he killed Grayson because he "wasn't right in [his] mind" or "lost [his] cool."

Audiotapes of four telephone calls defendant made from jail were played for the jury.  In a call on September 7, 2008, to his wife, defendant denied responsibility for Grayson's murder.  He said, "you know I was home with them babies, right? . . .  I can't be two places at once."  In a call to his mother, defendant gave an explanation for the blood in his car.  He said, "When I checked, went in the house to check her, maybe I got some blood on my hands.  I went back to get my cell phone . . . .  You know, saying that's probably how it got in my car.  Besides that, I ain't done anything."  In another call with his wife, defendant

repeated essentially the same explanation and added that he said "Blood I just, I had blood on my hands when I went inside the house and I wiped it (unintelligible) my car to get my phone to call the police" and "I was wipe up the blood.  I, I just, (unintelligible) I had blood on my hands, but I was wipin' it on the s-on the cement."  In another call, defendant repeated to his mother that he must have gotten blood in his car because he got blood on his hand checking Grayson to see if she was okay, and that he wiped his hand on the ground when he was trying to help J.  He also said he had called Grayson a few times but no one answered the phone.

**The Defense Case**

1.   Defendant's Direct Testimony

Defendant testified.  He married his wife in 2000 and had three young daughters.  He admitted having three extramarital affairs, two of which involved women who became pregnant and sued him for child support.  Both times DNA tests established that defendant was not the father.  Defendant's wife found out about both of these affairs, but agreed to reconcile with him.  Similarly, before his marriage defendant had a relationship with another woman who told him he was the father of her daughter.  Defendant helped support the child for nine years, until the woman filed for child support and a DNA test showed defendant was not the father.

Defendant started having an affair with Grayson in 2005.  In December 2006 she told him she was pregnant with his baby.  Grayson ultimately aborted the pregnancy, but a couple of months later she told defendant she wanted to have a child with him.  When she got pregnant again she said it was his baby and she wanted to keep it.  Defendant helped her by giving her about $150 or more a week and buying groceries and clothes for her and J.  He was happy when she told him the child was a boy.

Defendant would visit Grayson about once a week, give her money and have sex with her.  Grayson was sometimes angry at him for not spending more time with her.  She talked about putting the baby up for adoption, but only because she was pregnant, emotional and upset with him.  Defendant did not believe her because she continued to have him buy clothes for the baby.  On cross-examination, he admitted that he discussed putting the baby up for adoption with Grayson and that "If that's what she wanted to do, I was behind her 100 percent."

Defendant saw Grayson the night of Friday, September 5, 2008.  He brought her $150 for baby clothes, and they had sex.  On Saturday night, September 6, 2008, Grayson called defendant repeatedly urging him to come over to her apartment as he had promised.  She kept calling until about 10:00 p.m.  She was crying and said it was urgent that they talk.  Later that night, after his wife and daughters were asleep, defendant drove from Richmond to Grayson's, talking to her on the phone as he drove.

When defendant arrived, Grayson told him he was not the baby's father and that she was going to be with the father and would not see defendant anymore.  Defendant testified that he "[j]ust lost it ."  He told her, "Bitch, you must be crazy.  You fuckin' bitch.  How the fuck you gonna tell me that I'm not the father.  I'm taking care of you and your son, you

lying bitch." He testified he "just couldn't believe it. Just my sacrifice, and I was in love with her and my wife. I'm tore up inside." He screamed, "How can you do this to me? I've been knowing you for all this time. How can you just do this to me? I've been knowing you all this time. You can talk to me about anything. I'm taking care of you. I give you money. I give you $400. I give you $300. I give you 250. I give you 175. I take you to the Pak'n Save. I fed you and your son."

When defendant asked Grayson why she did not tell him sooner, Grayson said she needed the money. He called her a "trifling, scandalous ho, a bitch. I called her like about ten bitches, over and over again" and a "fuckin' whore and a slut." He was upset because she had told him she would never lie to him, and he loved her and had been sacrificing his marriage in order to see her and take care of her. He had also just found out three weeks earlier that the child he had been helping to support for nine years was not his.

Grayson called defendant a fool, and he spat in her face in response. She slapped him and he hit her in the face. Grayson grabbed his hood and face as they continued hitting each other and "tussling." Grayson hit him in the face with a shoe. That is when defendant saw a pair of scissors and started punching Grayson in the face with them. They fell onto the couch and defendant, his eyes covered by the hood that Grayson was still grabbing, continued stabbing her with the scissors. Defendant saw himself "out of [his] body" and was unable to stop stabbing defendant while screaming that he loved her.

Eventually Grayson let go of defendant's hood and he "snapped out of it" and ran out of the apartment. He did not know if she was dead, and tried to call her on the phone as he drove back to Richmond so he could apologize before she called the police. He could not believe what he had done. He did not call 911, however, even though he knew Grayson was pregnant. Instead, at 2:02 a.m. he called his friend Tommy Lyles, Grayson's cousin. He said that he and Lyles talked about football for about half an hour.

Defendant drove back to Grayson's house around 5:00 a.m. to find out what was going on. He thought that maybe she had gone to the hospital or that the police were looking for him. There was no answer when he knocked on her door, so he looked through her blinds and saw her lying on the couch. He thought she was dead, but he was not certain. Still, he did not call 911. Instead, he drove back to Richmond. He claimed he ripped his t-shirt on a fence as he left Grayson's apartment, and that the object visible in his hand on the surveillance tape was a piece of his shirt.

Defendant called Grayson again just after 9:00 a.m., thinking maybe she was "just knocked out." J. answered the phone and said "mommy is bleeding, blood." Defendant drove back to Grayson's house and J. let him in. He could tell that Grayson was dead or maybe dying. He flagged down two neighbors and told them there was a woman dead in the apartment. One of the neighbors told him to call 911.

### 2. Cross-examination

Defendant admitted on cross-examination that he consistently denied killing Grayson until May 12, 2009, after he heard the prosecutor's opening statement. Between September 7th

and May 5th defendant made 160 calls from jail to family members, always denying that he killed Grayson.

The prosecutor asked defendant to explain the inconsistency between his testimony that Grayson insisted he come to her apartment the night of her death, and the fact that defendant called her numerous times that evening.  Defendant testified that his cell phone kept dropping Grayson's calls so he would call her back.  A radio frequency manager from AT&T testified that, while there are some "dead areas" along Interstate 80 near Richmond, coverage south of Richmond is contiguous and it is possible to have a continuous call from Hilltop to Emeryville.

Defendant also admitted that he told a deputy district attorney that he retrieved a bag of condoms from Grayson's porch when he returned to her apartment around 6:00 a.m. on September 7, threw half of them in the garbage can, and discarded the rest on the freeway. However, he testified that he did not actually do any of those things, and that the object he carried when he left Grayson's apartment that morning was a fragment of his ripped t-shirt.

The parties stipulated that it was verified shortly before trial that defendant was not the father of Grayson's baby.

People v. Ashley, 2010 WL 3637543, *1-7 (Cal. Ct. App. September 21, 2010).

## III.  DISCUSSION

A.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal citation omitted).

United States District Court
Northern District of California

8

United States District Court
Northern District of California

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petitions for review.  The Court of Appeal, in its opinion on direct review, addressed several of the claims petitioner raises in the instant petition.  The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews herein except as noted below.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991).

B.    Petitioner's Claims

As grounds for habeas relief, petitioner claims that: (1) his trial counsel rendered ineffective assistance of counsel; (2) the trial court failed to properly instruct the jury; (3) prosecutorial misconduct; and (4) cumulative error.  The Court addresses each claim in turn.

I.    Ineffective Assistance of Counsel

Petitioner alleges that trial counsel was ineffective for failing to object or seek a mistrial when the prosecutor suggested during cross-examination that petitioner intended to kill the child J.; counsel was ineffective by failing to object during the prosecutor's closing arguments; and counsel was ineffective failing to obtain an expert on diabetes to testify about the effects of abnormal blood sugar on petitioner's ability to control his behavior.  (Second Amended Petition at 2, 5, 6.)

1.   <u>Cross Examination</u>

Petitioner contends that trial counsel was ineffective for failing to object to cross-examination questions that implied that petitioner intended to kill the child, J.

a.   <u>Background</u>

The Court of Appeal considered and rejected this claim as follows:

Defendant contends that his trial attorney provided constitutionally inadequate representation because he failed to object or move for a mistrial at various points in the trial.  Specifically, he argues his attorney should have objected or sought a mistrial when the prosecutor suggested during defendant's cross-examination that defendant intended to kill J. after taking him from Grayson's apartment . . . . and that he should have objected during the prosecutor's closing argument.  We are not persuaded.

. . .

During cross-examination, the prosecutor questioned defendant about his actions when he returned to Grayson's house for the third and last time on the morning of September 7.  The prosecutor asked defendant about the fact that he neither called 911 nor removed J. from Grayson's house after he "lost it" and attacked Grayson.  The prosecutor then asked the following series of questions about defendant's decision to take J. with him when he left the apartment around 9:30 a.m. "Q: At 9:00 in the morning, you start to call the house again? [¶] A: Yeah, I start calling the house again.  [¶] Q: And eventually you reach [J.]? [¶]  A. I reached [J.] on the phone....  [¶] Q: [J.] tells you that he saw you hurt his mommy? [¶]  A: He never told me that.  [¶] Q: And now you realize you've left another witness behind.  [¶]  A: Sir, I would never hurt anybody's kids.  [¶]  Q: You know, you did. [¶]  A: I Know.  [¶] Q: You hurt an unborn baby.  [¶]  A: When I was hitting her, I didn't even realize, I didn't even think.  The last thing I was thinking about her being pregnant.  I was just hitting her.  [¶]  Q: You killed an unborn baby.  [¶]  A: Yes, sir.  [¶]  ...  [¶]  Q: Now, [J.] told you that you hurt his mother?  [¶]  A: He never told me that.  All he said was 'My mommy's bleeding.'  [¶]  Q: And now you realize you have to return back another time?  [¶]  A: Another time. What you mean?  [¶]  Q: A third time you get to return- [¶]  A: He told me-he told me his mom was bleeding.  That's when I was at the house.  [¶]  Q: You knew she was dead.  [¶]  A: I didn't know she was dead.  I didn't

10

know what to think.  I got there 6:00 in the morning.  I called her.  She didn't answer.  I went to the house, looked through the window.  I didn't know what to think."

The prosecutor then established that defendant parked almost 300 feet from the apartment house on that third trip even though the parking spot he always used right in front of Grayson's building was free.  He asked: "Q: And you did that because you didn't want to be associated with that murder scene.  [¶]  A: I parked there because-I parked down the street.  I was afraid.  I was scared.  I didn't know what was going to happen, but I knew that I was associated with the crime.  [¶]  Q: *You parked down the street because you were going to go take that boy into his death next*.  [¶]  A: I didn't take the boy to his death.  I opened the door and I flagged somebody down and I called 911.  I'm going to sit here, knowing he saw me, and sitting here and just go and call 911 or something.  Come on."  (Italics added.)

Defendant argues his attorney should have objected or moved for mistrial at this point, and that his failure to do so was prejudicial.  We disagree.  Defense counsel could reasonably have made the tactical decision that an objection, whether sustained or overruled, would only serve to emphasize the prosecutor's suggestion to the jurors.  Moreover, it is highly unlikely that either an objection or a motion for mistrial would have succeeded.  Examination of a defendant may be vigorous.  (*People v. Cooper* (1991) 53 Cal .3d 771, 822.)  "Although a defendant cannot be compelled to be a witness against himself, if he takes the stand and makes a general denial of the crime with which he is charged, the permissible scope of cross-examination is 'very wide.'  [Citation.]  When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them.  [Citation.]  A defendant cannot, by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies."  (*Ibid*.)

It was not improper for the prosecutor to explore defendant's professed commitment to assisting Grayson's young son, specifically in light of his glaring failure to do so for some nine hours after he killed the boy's mother in their apartment.  Even then defendant did not call for help, as might be expected if he truly intended to help the child, but rather drove to the apartment and parked where his car would not be seen in front of the building.  The prosecutor's suggestion that there was a less than innocent explanation for defendant's actions that morning was within the broad scope of permissible cross-examination, and defense counsel had a reasonable basis to conclude that an objection or motion for a mistrial would be futile.  For the same reason, defendant cannot show that he was prejudiced by counsel's failure to challenge the question.

Ashley, 2010 WL 3637543 at *8-9.

        b.      Analysis

The Sixth Amendment to the United States Constitution guarantees not only assistance, but effective assistance, of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  Id.  To prevail on an ineffective assistance claim, a habeas petitioner must show that (1) counsel's performance was "deficient," i.e., his "representation fell below an objective standard of reasonableness" under prevailing professional norms, id. at 687-88, and (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, see id. at 691-94.

"A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 131 S. Ct. 770, 787 (2011) (quoting Strickland, 466 U.S. at 689).  The standards of both 28 U.S.C. § 2254(d) and Strickland are "highly deferential . . . and when the two apply in tandem, review is doubly so."  Id. at 788 (quotation and citations omitted).  When § 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

Petitioner has failed to demonstrate that the Court of Appeal's denial of this claim was an unreasonable application of Strickland.  Once petitioner chose to testify, the prosecutor was able to question petitioner regarding the incident and his returning to the crime scene to leave with the child.  "A defendant who testifies at trial waives his Fifth Amendment privilege and may be cross-examined on matters made relevant by his direct testimony."  United States v. Black, 767 F.2d 1334, 1341 (9th Cir. 1985) (citing Brown v. United States, 356 U.S. 148, 154-56 (1958)).

It was not improper for the prosecutor to question petitioner regarding his motives in removing the child, as petitioner had just recently murdered his mother and unborn sibling and the child seemed to have witnessed the incident.  Trial counsel could not be deficient for failing to

12

make a meritless objection. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005). Assuming that trial counsel was deficient, petitioner has still failed to show prejudice. The evidence was overwhelming against petitioner, and there were no charges relating to harming the child J. Finally, the trial court properly instructed the jury that "[n]othing the attorneys say is evidence. . . . Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they help you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggested it was true." (Reporter's Transcript ("RT") at 605-06.) This claim is denied.[3]

   2.   Closing Argument

Petitioner next argues that trial counsel was ineffective for failing to object to the prosecutor's closing argument where he distorted the distinction between justifiable homicide and manslaughter.

   a.   Background

The Court of Appeal considered and rejected this claim as follows:

Defendant next argues that the prosecutor seriously distorted the distinction between justifiable homicide and manslaughter by implying in closing argument that the availability of the heat of passion defense depends not on whether defendant was reasonably provoked, but on whether he acted reasonably after the provocation. The challenged argument was as follows.

"Voluntary manslaughter. Voluntary manslaughter is an unlawful killing. Let me start with that. There is intent to kill and it occurs in the context of a sudden quarrel or heat of passion. It is a limited exception, however. Voluntary manslaughter reduces murder if the provocation is of a type to excite and arouse the passions of the defendant, and he acted under those passions. But this is the kicker: It's not just that the defendant acted under those situations. Here it is, ladies and gentlemen: Ordinary, reasonable people. What would an ordinary, reasonable person do to an eight-and-a-half-month pregnant woman when they found out supposedly-and we'll talk about this, because it's a lie like the rest-that he wasn't the father of the child. [¶] Just assuming arguendo, that everything that he said with respect to that, when she told him that, an ordinary, reasonable person does kill in

_____

[3] To the extent petitioner has exhausted and presented a claim that counsel was ineffective for failing to object when the prosecutor stated in closing arguments that that petitioner left the little boy to find his mother's body, any such claim is denied. Petitioner contends that the prosecutor was appealing to the jury's sense of outrage by stating this; however, it was an accurate reflection of the facts that had been presented at trial. Trial counsel was not deficient for failing to object, nor was there any prejudice.

United States District Court
Northern District of California

those circumstances.  People find out all the time that they're not parents.  People find out all the time that there's an affair.  It doesn't mean that you are now legally justified to kill.  Context is everything.  [¶]  He is not permitted in voluntary manslaughter to set up his own standard.  When he says, 'I was provoked and I had to pick up the scissors and hit her' or punch or whatever he said in that regard, 'and I needed to do that,' first of all, he didn't need to do that.  There was nothing that justified his necessity in picking up those shears to begin with and start punching her.  But even if he thought so, he's not permitted to set up his own standard.  We go back to what's reasonable.  What does a reasonable person do in that circumstance?  If you're in a fight and you've been hit, do you think the next step is to go to the nuclear option?  He went nuclear.  He didn't have to pick up a deadly dangerous weapon on the couch.  That's not a reasonable person's actions.  Therefore, we're in the area of murder, aren't we?"  FN1

> FN1. The prosecutor's formulation of the standard is incorrect.  The consideration that reduces a murder to heat of passion voluntary manslaughter focuses on whether the defendant was reasonably provoked, not on whether once provoked the defendant acted reasonably in killing someone.  (People v. Steele (2002) 27 Cal.4th 1230, 1252; People v. Wickersham (1982) 32 Cal.3d 307, 326-327, disapproved on another point in People v. Barton (1995) 12 Cal.4th 186, 201.)

Even assuming arguendo that counsel's failure to object to this incorrect legal formulation cannot be supported by a rational tactical reason, there is no basis for a finding of prejudice.  The trial court correctly instructed the jury on the definition of provocation and voluntary manslaughter pursuant to CALCRIM Nos. 522 and 570.  FN2  The jurors were also instructed that they must follow the law as explained by the court even if they disagreed with it, and that "*[i]f you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions.*"  (Italics added.) (CALCRIM No. 200.)  The record provides no reason to believe the jury disregarded the court's instructions in favor of the prosecutor's argument.  "[A]rguments of counsel generally carry less weight with a jury than do instructions from the court.  The former are usually billed in advance to the jury as matters of argument, not evidence, ... and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law."  (Boyde v. California (1990) 494 U.S. 370, 384.)  Moreover, this was by no means a close case.  To the contrary, defendant's testimony was so riddled with fabrications, and his provocation defense so blatantly of recent concoction, that it is all but inconceivable that a jury would have convicted him of manslaughter but for the prosecutor's allegedly erroneous argument.

> FN2. The jury was instructed that "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter.  The weight and significance of the provocation, if any, are for you to decide.  [¶]  If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.  Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.  [¶]  A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant kills someone because of a sudden quarrel or in the heat of passion.  [¶]  The defendant killed someone because of a sudden quarrel or in the heat of passion if:  [¶]  One, the defendant was provoked;

14

two, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and three, the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.  [¶] Heat of passion does not require anger, rage or any specific emotion.  It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.  [¶]  In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it.  While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or a long period of time.  [¶]  It is not enough that the defendant simply was provoked.  The defendant is not allowed to set up his own standard of conduct.  In deciding whether the provocation was sufficient, consider whether an ordinary person of average disposition, in the same situation and knowing the same facts, would have acted from passion rather than from judgment. [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion.  If the People have not met this burden, you must find the defendant not guilty of murder."

Ashley, 2010 WL 3637543 at *10-11.

    b.    Analysis

    As noted by the Court of Appeal, even assuming that trial counsel was deficient for failing to object, petitioner has failed to demonstrate prejudice.  This conclusion is not contrary to established Supreme Court authority.  The trial court properly instructed the jury on provocation and voluntary manslaughter, and the jury was also instructed to follow the court's instructions if they differed from an attorney's comments.  Moreover, "[a]rguments of counsel generally carry less weight with a jury than do instructions from the court."  Boyde v. California, 494 U.S. 370, 384 (1990).  In Brown v. Payton, 544 U.S. 133 (2005), the Supreme Court held that even where the prosecutor concededly misstated the law and the trial court did not correct the misstatement, a state court's finding that the jury was not reasonably likely to have accepted the prosecutor's narrow view was not an unreasonable application of Supreme Court authority.  Brown, at 141-44.  Nor was this a close case in which the evidence even remotely indicated that petitioner was only

15

guilty of manslaughter.  The Court of Appeal's decision was not objectively unreasonable, therefore this clam is denied.

### 3.  Expert Witness

Petitioner states that trial counsel was ineffective for failing to obtain an expert on diabetes to testify about the effects of abnormal blood sugar on petitioner's ability to control his behavior. This claim was presented to the California Supreme Court in a habeas petition and denied without a reasoned opinion.  (Ex. 12-13.)  In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000).  When confronted with such a decision, a federal court should conduct an independent review of the record to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law.  Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982.

#### a.  Analysis

Petitioner states that his wife and mother both spoke to trial counsel regarding petitioner's abnormal behavior and possible connection to his diabetes.  Petitioner argues that trial counsel was ineffective for failing to obtain a medical expert to testify regarding the connection between petitioner's diabetes and his abnormal behavior that could have reduced the verdict to manslaughter.  Other than his speculation that his diabetes caused him to commit the murder, petitioner offers no evidence to support his claim.  Unsupported and "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."  James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994).

Petitioner's mere speculation that a witness might have given helpful information is not enough to establish ineffective assistance.  See Bible v. Ryan, 571 F.3d 860, 871 (9th Cir. 2009) (speculation about organic brain dysfunction insufficient to show Strickland prejudice); see also Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001). Petitioner has offered no evidence that a diabetes expert would have testified on his behalf at trial. He merely speculates that such an expert could be found.  Such speculation is insufficient to

16

1   establish prejudice.  Wildman v. Johnson, 261 F.3d 832, 839 (9th Cir. 2001).  Petitioner has failed

2   to demonstrate that the state court denial of this claim was an unreasonable application of

3   Strickland.

4      II. Jury Instructions

5      Petitioner argues that the trial court erred by failing to instruct the jury sua sponte on heat

6   of passion voluntary manslaughter.  This claim was also presented to the California Supreme

7   Court in a habeas petition and denied without a reasoned opinion.  (Ex. 10-11.)  The Court

8   therefore conducts an independent review of the record to determine whether the state court's

9   decision was an objectively unreasonable application of clearly established federal law.  Himes,

10   336 F.3d at 853; Delgado, 223 F.3d at 982.

11      However, a review of the trial record indicates that the jury was instructed on provocation,

12   heat of passion and voluntary manslaughter.  RT at 618-19; CT at 99-100.  As noted in the prior

13   claim regarding trial counsel failing to object to closing argument, the California Court of Appeal

14   stated that the trial court properly instructed the jury regarding provocation and voluntary

15   manslaughter.  Ashley, 2010 WL 3637543 at *10, n.2.[4]  As the jury did receive these instructions,

16   petitioner's claim is denied.

17      III. Prosecutorial Misconduct

18      Similar to his prior claim of ineffective assistance of counsel, petitioner contends that the

19   prosecutor committed misconduct by asking petitioner during cross examination if petitioner

20   intended to harm the child, J., because he was a witness to his mother's murder.

21      a. Analysis

22      Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate standard

23   of review is the narrow one of due process and not the broad exercise of supervisory power.

24   Darden v. Wainwright, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated

25   when a prosecutor's misconduct renders a trial "fundamentally unfair."  Id.; Smith v. Phillips, 455

26

27   _____

28   [4] The Court quoted the jury instruction given by the trial court in the prior claim above.  See, supra at 14-15.

U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness.  Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).  A prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted).

Factors which a court may take into account in determining whether misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt, compare United States v. Young, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt) with United States v. Schuler, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior hung jury and lack of curative instruction, new trial required after prosecutor's reference to defendant's courtroom demeanor); (2) whether the misconduct was isolated or part of an ongoing pattern, see Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to a critical part of the case, see Giglio v. United States, 405 U.S. 150, 154 (1972) (failure to disclose information showing potential bias of witness especially significant because government's case rested on credibility of that witness); and (4) whether a prosecutor's comment misstates or manipulates the evidence, see Darden, 477 U.S. at 182.

In denying the ineffective assistance of counsel claim the California Court of Appeal noted:

> It was not improper for the prosecutor to explore defendant's professed commitment to assisting [the victim's] young son, specifically in light of his glaring failure to do so for some nine hours after he killed the boy's mother in their apartment.  Even then defendant did not call for help, as might be expected if he truly intended to help the child, but rather drove to the apartment and parked where his car would not be seen in front of the building. The prosecutor's suggestion that there was a less than innocent explanation for defendant's actions that morning was within the broad scope of permissible cross-examination, and defense counsel had a reasonable basis to conclude that an objection or motion for a mistrial would be futile.

Ashley, 2010 WL 3637543 at *9.

1      Similarly, this Court has already found that the line of questioning was appropriate.  Even

2  assuming that the questions did constitute misconduct, petitioner has not shown that it rendered

3  the trial fundamentally unfair.  Petitioner's allegations of misconduct relate to the child J., not the

4  victim or her unborn baby, who were the victims.  As there was overwhelming evidence and the

5  alleged misconduct did not relate to a critical part of the case, petitioner is unable to demonstrate

6  that the conduct infected the trial with unfairness.  This claim is denied.

7      IV.    Cumulative Error

8      Petitioner maintains that the cumulative impact of the prior claims violated due process.

9  This claim was also presented to the California Supreme Court in a habeas petition and denied

10  without a reasoned opinion.  (Ex. 10-11.)  The Court will conduct an independent review of the

11  record to determine whether the state court's decision was an objectively unreasonable application

12  of clearly established federal law.  Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982.

13      a.    Analysis

14      In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

15  the cumulative effect of several errors may still prejudice a defendant so much that the conviction

16  must be overturned.  See Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing

17  conviction where multiple constitutional errors hindered defendant's efforts to challenge every

18  important element of proof offered by prosecution).  Cumulative error is more likely to be found

19  prejudicial when the government's case is weak.  See id.  However, where there is no single

20  constitutional error existing, nothing can accumulate to the level of a constitutional violation.  See

21  Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011).  Similarly, there can be no cumulative error

22  when there has not been more than one error.  United States v. Solorio, 669 F.3d 943, 956 (9th Cir.

23  2012).

24      The Court has found no errors in Petitioner's trial, let alone multiple constitutional errors

25  of the kind warranting habeas relief.  There is no merit to any of petitioner's claims that trial

26  counsel was ineffective or that there was prosecutorial misconduct.  Nor was this a case where the

27  government's case was weak, as there was overwhelming evidence that petitioner murdered both

28

United States District Court
Northern District of California

19

1  victims.  This claim is denied.

2  C.       Certificate of Appealability

3        The federal rules governing habeas cases brought by state prisoners require a district court

4  that issues an order denying a habeas petition to either grant or deny therein a certificate of

5  appealability.  See Rules Governing § 2254 Case, Rule 11(a).

6        A judge shall grant a certificate of appealability "only if the applicant has made a

7  substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

8  certificate must indicate which issues satisfy this standard.  Id. § 2253(c)(3).  "Where a district

9  court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)

10 is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district

11 court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S.

12 473, 484 (2000).

13        This is not a case in which reasonable jurists would disagree with the Court's ruling on any

14 of the claims.  Therefore a certificate of appealability is denied.

## IV.  CONCLUSION

16        For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a

17 certificate of appealability is DENIED.

18        The Clerk shall enter judgment in favor of respondent and close the file.

19        **IT IS SO ORDERED.**

20 Dated: June 8, 2014

21

22                          JON S. TIGAR
                           United States District Judge